

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DJ:AJE/PJC
F. #2018R00675

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 4, 2022

By ECF

The Honorable Nicholas G. Garaufis
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

        Re:    United States v. Yekaterina Kleydman,
                  Criminal Docket No. 18-310 (NGG)

Dear Judge Garaufis:

      The government respectfully submits this letter in anticipation of sentencing in the above-captioned case, which is scheduled for March 11, 2022. On October 27, 2021, defendant Yekaterina Kleydman pleaded guilty to Count One of the indictment, which charged her with health care fraud, in violation of 18 U.S.C. § 1347. For the reasons set forth below, the government respectfully submits that a sentence within the advisory United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 30 to 37 months' imprisonment, as set forth in the February 14, 2022 Presentence Investigation Report (the "PSR"), is sufficient, but not greater than necessary, to achieve the goals of sentencing. See 18 U.S.C. § 3553(a). The government also respectfully requests that the Court impose an order of restitution to the Medicare program in the amount of $201,648.27 and to Medicaid plans in the amount of $38,122 and a forfeiture money judgment in the amount of $239,770.27.

I.      Background

      A.      The Fraudulent Scheme

      As charged in the indictment and as outlined in the PSR, the defendant, a licensed dermatologist in Brooklyn, New York, executed a scheme between approximately January 2015 and March 2018 to defraud Medicare, Medicaid and other health care benefit programs by submitting false and fraudulent claims for the removal and destruction of purportedly inflamed and irritated seborrheic keratoses ("ISKs") when the defendant actually removed seborrheic keratoses ("SKs") that were not inflamed or irritated, or that were not SKs, but instead skin tags. (See Indictment ¶¶ 13-14; PSR ¶ 16). The defendant did this through the medical practice she

controlled, Kleydman Dermatology PLLC, which was located on Ocean Avenue, in Brooklyn, New York. (PSR ¶ 16).

The defendant was enrolled as a provider in the Medicare and Medicaid programs since at least 2013. (Id.). As an enrolled provider, she repeatedly attested, among other things, that she understood and would abide by the laws and regulations of the Medicare and Medicaid programs, that she would not knowingly present or cause to be presented false or fraudulent claims for payment, and that she would not submit claims with deliberate ignorance or reckless disregard of their truth or falsity. (See, e.g., Exhibit A). Nonetheless, the defendant repeatedly submitted claims for the destruction of purported ISKs when the skin conditions were either (1) not actually inflamed or irritated or (2) not a seborrheic keratosis, but instead a skin tag (allowing the defendant to fraudulently bill Medicare and Medicaid for the higher reimbursement rate for ISKs).

Seborrheic keratoses and skin tags are common, benign skin conditions that are very rarely inflamed to the point that it is medically necessary to remove them. (PSR ¶ 17). Medicare, Medicaid and Medicaid managed care organizations did not reimburse practitioners for treatments that were not medically necessary, but instead cosmetic. (Id.). However, it was a general rule within the defendant's medical practice that medical assistants ("MAs") would document any skin lesion that was treated with liquid nitrogen, sometimes referred to as cryotherapy, as an ISK so that the treatment would be covered by health insurance. (Id.). The defendant ultimately signed and approved these patient charts. (Id.). This rule was conveyed to the MAs by the defendant and her senior staff and it was reflected in written procedures used to train MAs regarding the proper functioning of the defendant's office and the role of the defendant's MAs. (Id.). For example, the Medical Assistant Manual at the defendant's practice stated: "If Dr. Kleydman treats the SKs with cryotherapy then the impression is ISK if she just counsels the patient on SKs and no treatment is performed then the impression is just SK." (Id.).

Current Procedural Terminology ("CPT") codes were used in billing Medicare and Medicaid plans to identify the procedures performed for different skin conditions. (Indictment ¶ 10, PSR ¶ 15). There were different CPT codes for the removal of skin tags and other benign lesions (which included seborrheic keratoses). CPT code 17110 referred to the destruction (e.g., laser surgery, electrosurgery, cryosurgery, chemosurgery, surgical curettement), of benign lesions other than skin tags or cutaneous vascular proliferative lesions, for up to 14 lesions; CPT code 17111 referred to the same destruction as code 17110, but for 15 or more lesions. (PSR ¶ 18). CPT code 11200 referred to the removal of 15 skin tags or multiple fibrocutaneous tags; CPT code 11201 referred to the same removal procedure, but for each 10 additional tags. (Id.).

Between approximately January 2015 and March 2018, the defendant submitted over $1.8 million in claims to Medicare and Medicaid plans for purported procedures using CPT codes 17110 and 17111; in particular, she submitted approximately $708,958 to Medicare and $1,180,873 to Medicaid plans using these codes. (PSR ¶ 19). Medicare paid $210,284 on these claims and Medicaid paid $231,135. (Id.). More specifically, of these claims, over $1 million in such claims were submitted using specific diagnosis codes used to identify an ISK. (Id. ¶ 22). Of the claims submitted with these specific diagnosis codes, the defendant submitted

approximately $678,978 to Medicare and $409,996 to Medicaid plans. (Id.). Medicare paid $201,648.27 and Medicaid plans paid $38,122 on these claims. (Id.).

By contrast to this extensive billing, the defendant submitted only a single claim to a Medicare or Medicaid plan using the CPT code 11200 (for removal of skin tags) in August 2014. (Id. ¶ 20). That claim was significantly less profitable for the defendant's practice, as it was a claim for $287, and Medicare paid only $41. (Id.).

A significant portion of the defendant's billings were for the code 17111, which would be used if it were medically necessary and reasonable to remove 15 or more benign lesions. (Id. ¶ 21). A peer comparison for Medicare providers in New York reflects that, from January 1, 2015 to April 17, 2018, the defendant was the second highest provider billing Medicare for CPT Code 17111, with more than $325,000 billed for that code for approximately 335 beneficiaries. (Id.).

B. The Defendant's Plea

On October 27, 2021, the defendant pleaded guilty to Count One of the Indictment. During her allocution, the defendant admitted that she "caused false claims to be submitted that [she] knew were false," to "Medicare and Medicaid." (Oct. 27, 2021 Tr. at 25). In answering the Court's questions, she acknowledged that these were claims for reimbursement for procedures for her patients between January 2015 and March 2018, and she did this knowingly and intentionally. (Id. at 25-26).

II. The Defendant's Guidelines Range

The government agrees with the Guidelines calculation contained in paragraphs 28 through 38 of the PSR, as set forth below:

| | |
|---|---:|
| Base Offense Level: 6 (U.S.S.G. §2B1.1(a)) | 6 |
| Plus: Loss above $550,000 (U.S.S.G. §2B1.1(b)(1)(H)) | +14 |
| Plus: Abuse of trust or use of special skill (U.S.S.G. §3B1.3) | +2 |
| Subtotal: | 22 |
| Minus: Acceptance of responsibility | -3 |
| Total: | 19 |

(PSR ¶¶ 28-38). The defendant stipulated to the Guidelines calculation set forth in the PSR in the parties' plea agreement. (Court Exhibit 1 at ¶ 2).

The resulting Guidelines level of 19 in the PSR calls for a sentence in the range of 30 to 37 months' imprisonment. The Probation Department has also, consistent with the terms of the plea agreement, recommended an order of restitution in the amount of $239,770.27 (PSR ¶ 85).

3

III. A Sentence of Incarceration Within the Advisory Guidelines Range is Appropriate

 A. Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 543 U.S. 220, 245 (2005); see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit has held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Second Circuit declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Subsequently, in Gall v. United States, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Id. at 49 (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the Court] may not presume that the Guidelines range is reasonable. [The Court] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a), provides numerous factors that the Court must consider in sentencing the defendant. These factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment, (b) afford adequate deterrence to criminal conduct, (c) protect the public from further crimes of the defendant, and (d) provide the defendant with appropriate education or vocational training; (3) the kinds of sentences available; (4) the Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution. 18 U.S.C. § 3553(a).

 B. Application of Law

The government respectfully requests that the Court impose a sentence of imprisonment within the advisory Guidelines range because such a sentence is sufficient but not greater than necessary to achieve the goals of sentencing. See 18 U.S.C. § 3553(a). Specifically, the circumstances in this case, the history and characteristics of the defendant, the need to promote respect for the law and provide just punishment and the need for specific and general deterrence warrant a custodial sentence within the advisory Guidelines range.

4

    1.  The Nature and Circumstances of the Offenses and the History and Characteristics of the Defendant

  A Guidelines sentence is appropriate considering the nature and circumstances of this offense. The defendant's conduct is serious. The defendant engaged in a sustained pattern of submitting false and fraudulent claims to the Medicare and Medicaid programs. Instead of making money honestly, the defendant decided to increase her income through a long-running scheme to defraud vital taxpayer-funded programs, including by submitting claims for reimbursement for procedures that were not medically necessary, but instead merely cosmetic.

  The defendant's conduct also constitutes a serious breach of the trust that the American public has placed in her as a provider in the Medicare and Medicaid programs. The Medicare program is an entirely "trust-based system," meaning that "Medicare does not verify that procedures were actually performed by, for example, cross-referencing claims with medical records, but rather it relies on the representations of the medical professionals that each claim submitted was performed as billed." See United States v. Ahmed, No. 14-CR-277 (DLI), 2017 WL 3149336, at *2 (E.D.N.Y. July 25, 2017). Thus, to accomplish her criminal objective, the defendant had to betray the trust the Medicare and Medicaid programs as well as the public place in medical professionals, both to use their medical judgment to help patients and to act as responsible stewards of the money our society places at their disposal to provide that help. The defendant broke that trust by turning to fraud to line her pockets at the taxpayers' expense. Simply put, this was not a crime of need. Nor was it a crime resulting from events thrust upon her by outside forces. To the contrary, it was a crime of choice driven by the defendant's greed.

    2.  Reflecting the Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment

  The defendant's decision to operate the scheme for over three years shows a lack of respect for the law. These considerations weigh in favor of a substantial sentence that would convey the seriousness of her decision to exploit the trust of the Medicare and Medicaid system for her own financial benefit.

  Fraud against the Medicare and Medicaid programs is a serious offense that targets a national program relied on by millions of Americans. Congress aptly summarized the effects of health care fraud over forty-five years ago:

> In whatever form it is found, . . . fraud in these health care financing programs adversely affects all Americans. It cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program. It diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services.

H.R. 95-393, pt. II, at 44 (1977); see also H.R. Rep. 104-747 (1996) ("Everyone pays the price for health care fraud: beneficiaries of Government health care insurance such as Medicare and Medicaid pay more for medical services and equipment; consumers of private health insurance pay higher premiums; and taxpayers pay more to cover health care expenditures."). These concerns are just as pressing today as they were then, which is why Congress has enacted

increasingly severe penalties for health care fraud, most recently directing the Sentencing Commission to add enhancements for defendants who commit the most financially serious health care frauds.  See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, §10606(a)(2)(C), 124 Stat. 119, 1007 (2010) (directing Sentencing Commission to amend guidelines in order to punish health care fraud more severely).

The defendant engaged in a long-running scheme to submit false and fraudulent claims to Medicare and Medicaid for services that were not rendered as claimed or that were not medically necessary.  She did so repeatedly and at an exceptional rate – she was the second-highest provider in New York billing the Medicare program for purportedly medically necessary removals of 15 or more benign lesions, for approximately 335 patients.  (PSR ¶ 21).  A custodial sentence is required to reflect the seriousness of that conduct, to promote respect for the law and to adequately punish the defendant for the calculated steps she took to further this scheme.

        3.        Affording Deterrence and Protecting the Public

The Court's sentence should also further the aims of specific and general deterrence.  18 U.S.C. § 3553(a)(2)(B), (C).

Although this is the defendant's first criminal conviction, it is notable that her conduct was not a single failure of judgment or momentary ethical lapse.  As described above, the defendant's conduct involved repeated, deliberate decisions – choices she made in her own interactions with patients, her supervision of employees and her promise to submit claims that were accurate and truthful.

A Guidelines sentence is further necessary to deter not only the defendant, but also similarly-situated individuals from engaging in fraudulent behavior.  Fraud schemes like the one perpetrated in this case threaten the integrity of the Medicare and Medicaid programs.  Because the profits of these schemes are often enormous — the only limiting variables are the criminals' ability to manufacture Medicare and Medicaid claims and their likelihood of getting caught — it is critical to address the problem through systematic deterrence.

Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks and citation omitted).  As the Court has recognized, "[t]he need for general deterrence is particularly acute in the context of white-collar crime."  United States v. Johnson, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018); see also; United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").  This is true, in part, because "[p]ersons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed."  See Johnson, 2018 WL 1997975 at *5; see also Harmelin v. Michigan, 501 U.S. 957, 988 (1991) ("[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").  This is especially true when the potential rewards for would-be criminals who are not caught can be substantial.

The need to promote general deterrence is particularly acute in cases where, like in the defendant's case, a government insurance program is the victim. Fraud against Medicare, Medicaid and other public insurance programs diverts scarce resources from the people those programs are designed to serve – the patients and beneficiaries – into the pockets of those who lie and cheat. The defendant's sentence should take into account the need to deter other people who may be tempted to commit similar crimes from enriching themselves at the expense of the public.

IV.     Restitution and Forfeiture

Under 18 U.S.C. § 3663A, the Court shall impose restitution. In United States v. Zangari, 677 F.3d 86, 93 (2d Cir. 2012), the Second Circuit held that restitution must be measured according to the victim's actual loss, not the defendant's gain. Moreover, in calculating restitution, "these losses need not be mathematically precise," and "[a] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable." United States v. Rivernider, 828 F.3d 91, 115 (2d Cir. 2016) (internal quotation marks omitted).

The government respectfully submits that the Court should order the defendant to pay restitution in the amount of $201,648.27 to Medicare, $2,563 to Medicaid and $35,559 to the identified Medicaid managed care plans set forth separately. (See PSR ¶¶ 22, 25, 85; March 1, 2022 Addendum to PSR).

In addition, the defendant acknowledged in the plea agreement that she obtained and acquired property that is subject to forfeiture, and she consented to the entry of a forfeiture money judgment in the amount of $239,770.27. (Id. ¶ 4).

V.      Conclusion

For the foregoing reasons, and based on a balancing of the § 3553(a) factors, the Court should impose a sentence with the Guidelines range described herein – 30 to 37 months of

7

imprisonment – as well as order the defendant to pay restitution in the total amount of $239,770.27 and a forfeiture money judgment in the amount of $239,770.27.

                                      Respectfully submitted,

                                      BREON PEACE  
                                      United States Attorney  
                                      Eastern District of New York

                                      JOSEPH S. BEEMSTERBOER  
                                      Acting Chief  
                                      Criminal Division, Fraud Section  
                                      U.S. Department of Justice

By:    /s/_____  
           Andrew Estes  
           Patrick J. Campbell  
           Trial Attorneys  
           Criminal Division, Fraud Section  
           U.S. Department of Justice

cc:    Jonathan Rosen, Esq.  
        Probation Officer Roberta Houlton